UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
CASE NO. _____

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

TARONIS TECHNOLOGIES, INC.
(n/k/a BBHC, INC.),
TARONIS FUELS, INC.,
SCOTT DAVID MAHONEY, and
TYLER BURNETT WILSON,

Defendants.

_____/

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
AND DEMAND FOR JURY TRIAL**

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") alleges:

I. **INTRODUCTION**

1.     From approximately January 2019 to March 2020, Taronis Technologies, Inc., n/k/a BBHC, Inc. ("Taronis Tech"), and from approximately February 2020 to November 2020, Taronis Tech's former subsidiary, Taronis Fuels, Inc. ("Taronis Fuels"), Arizona-based producers of fuel and water products, and the former Chief Executive Officer ("CEO") of both companies during the relevant time periods, Scott David Mahoney ("Mahoney"), engaged in a fraudulent

scheme to deceive investors and potential investors about Taronis Tech's and Taronis Fuels' successes by issuing numerous materially false and misleading press releases touting agreements and relationships with customers that did not exist or were exaggerated.  Mahoney devised and controlled the communication campaign and had ultimate authority for the issuance of these materially false and misleading press releases, which he often drafted himself and in which he frequently was quoted.

2.     In addition, Taronis Fuels' financial statements for the quarterly periods ending June 30, 2020 ("Q2 2020") and September 30, 2020 ("Q3 2020") improperly recognized revenue as a result of intentional or severely reckless incorrect application of Generally Accepted Accounting Principles ("GAAP"). From approximately April 2020 to November 2020, Mahoney and Taronis Fuels' former General Counsel ("GC") and Chief Financial Officer ("CFO"), Tyler Burnett Wilson ("Wilson"), knowingly or recklessly engaged in this improper accounting scheme and falsified Taronis Fuels' books and records by creating fake and backdated orders, which resulted in Taronis Fuels improperly recognizing this revenue.  Then, from approximately July 2020 to November 2020, Taronis Fuels raised approximately $30 million from investors, while making misleading representations and warranties that the financial statements in SEC filings were prepared in accordance with GAAP.

3.      By engaging in this conduct, the Defendants are liable as follows, and unless enjoined, are reasonably likely to continue to violate the federal securities laws:

a.      Taronis Tech violated Sections 10(b) and 13(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.

b.      Taronis Fuels violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 12b-25, 13a-11, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.12b-25, 240.13a-11, and 240.13a-13] thereunder.

c.      Mahoney and Wilson violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2] thereunder, and Section 304 of the Sarbanes-Oxley Act of 2002 ("SOX") [15 U.S.C. § 7243].

d.      Mahoney and Wilson also aided and abetted Taronis Fuels' violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.12b-20 and 240.13a-13] thereunder.

e.      In addition, Mahoney aided and abetted Taronis Tech's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] thereunder.

f.      Mahoney and Wilson also are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Taronis Fuels' violations of Sections 10(b), 13(a), 13(b)(2)(A), and13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 10b-5,

12b-20, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, and 240.13a-13] thereunder.

g.    Mahoney further is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Taronis Tech's violations of Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, and 13a-11 [17 C.F.R. §§ 240.10b-5, 240.12b-20, and 240.13a-11] thereunder.

## II.   <u>JURISDICTION AND VENUE</u>

4.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 20(e), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e), and 77v(a)]; and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

5.    This Court has personal jurisdiction over the Defendants, and venue is proper in the Middle District of Florida pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b).   Among other things, Defendants transacted business in this judicial district while certain of the acts, practices, and courses of conduct constituting the violations alleged in this Complaint occurred.   Taronis Tech and Taronis Fuels, under the management and supervision of Mahoney and Wilson, conducted business and operated facilities in this district; Taronis Tech and Taronis Fuels provided tours of its facilities located in this district to investors and potential investors; Taronis Fuels and Mahoney hosted a delegation of Turkish government officials in this district; and certain investors and employees of

4

Taronis Tech and Taronis Fuels, who are relevant to this action, reside in this district.

6.      In connection with the conduct alleged in the Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## III.   DEFENDANTS

7.      **Taronis Tech** (n/k/a BBHC, Inc., f/k/a as 4307, Inc., MagneGas Corporation, MagneGas Applied Technology Solutions, Inc., and then Taronis Technologies, Inc.) is a Delaware corporation headquartered in Peoria, Arizona and previously headquartered in Clearwater, Florida.   Its common stock is registered with the Commission under Section 12(g) of the Exchange Act, and unsolicited quotations for its common stock are quoted on OTC Link (whose parent company is OTC Markets Group, Inc.) under the symbol TRNX (previously MNGA until February 20, 2019).   On July 1, 2020, NASDAQ filed a Form 25 with the Commission to report the delisting of TRNX, effective July 13, 2020.   Taronis Tech is delinquent in its periodic filings with the Commission, last filing a Form 10-Q on November 19, 2019, for the quarterly period ending September 30, 2019 ("Q3 2019").   By approximately April or May 2020, Taronis Tech had no operations.

8.      **Taronis Fuels** is a Delaware corporation headquartered in Peoria, Arizona, with operations in Clearwater, Florida; Sarasota, Florida; Lakeland, Florida; and Tampa, Florida, among other locations.   Its common stock was

registered with the Commission under Section 12(g) of the Exchange Act until May 23, 2022 (when Taronis Fuels filed a Form 15 with the Commission to terminate its registration), and unsolicited quotations for its common stock are quoted on OTC Link under the symbol TRNF (previously TRFN until March 24, 2020, and TRNFD from December 30, 2020 to January 29, 2021). Taronis Fuels initially was organized as a Delaware limited liability company on February 1, 2017, under the name, MagneGas Welding Supply, LLC, but then, on April 9, 2019, it was converted into Taronis Fuels, a Delaware corporation. It was a wholly-owned subsidiary of Taronis Tech, but it was spun-off from Taronis Tech in or around December 5, 2019. At the time of filing to terminate its registration with the Commission on May 23, 2022, Taronis Fuels had been delinquent in its periodic filings with the Commission, last filing its Q3 2020 Form 10-Q on November 19, 2020. As of approximately May 2021, Taronis Fuels had approximately 180 employees.

9.     **Mahoney**, 47, is a resident of Peoria, Arizona. Mahoney has been Taronis Tech's CEO and a director on its Board of Directors since November 2018, and previously served as Taronis Tech's CFO and Secretary from December 2016 until November 2018. Mahoney also was Taronis Fuels' CEO and a director on its Board of Directors from its formation until resigning on April 2, 2021, and briefly served as Taronis Fuels' Interim CFO and Treasurer in December 2020.

10.     **Wilson,** 38, is a resident of Peoria, Arizona and an attorney admitted to the Idaho and Washington state bars. Wilson is currently a director on Taronis Tech's Board of Directors, and also held the following positions at Taronis Tech:

(a) GC from approximately June 2017 to May 6, 2021, (b) CFO from approximately September 1, 2019 to May 6, 2021, and (c) Secretary from approximately December 2018 to May 6, 2021.  Wilson also held the following positions at Taronis Fuels: (a) GC from approximately 2018 to May 6, 2021, (b) CFO from approximately September 1, 2019 to November 4, 2020, and (c) Secretary from approximately 2018 to May 6, 2021.  In addition, Wilson traveled at least twice to Florida for work-related trips in 2019, including once to Miami and Tampa in or around the spring of 2019 and once to Orlando in or around November or December 2019. Since May 7, 2021, Wilson has been the GC of a private investment firm based in Boca Raton, Florida.

## IV.   **OTHER RELEVANT PERSONS AND ENTITIES**

11.   **Turkish Family** is a family in the Republic of Turkey ("Turkey") that knows prominent Turkish government officials, and which partnered and worked with Taronis Tech and Taronis Fuels, including through the Turkish Family's two companies, defined in the next two paragraphs.

12.   **Turkish Family Company A** is one of the Turkish Family's companies organized and existing under the laws of Turkey, and which signed a Gasifier Purchase Agreement with Taronis Fuels in or around July 17, 2019.

13.   **Turkish Family Company B** is one of the Turkish Family's companies organized and existing under the laws of Turkey, which partnered with Taronis Fuels to form the Turkish JV (defined in the next paragraph), and which

signed a Gasifier Purchase Agreement with Taronis Fuels in or around January 3, 2020.

14.     **Turkish JV** is Taronis Fuels Gaz Teknoloji Enerji Sanayi Ve Ticaret Limited Sirketi, a joint venture ("JV") entity formed pursuant to the laws of Turkey between Taronis Fuels and Turkish Family Company B, pursuant to a JV Agreement signed in or around September 10, 2020.

15.     **Tech-Gas Solutions ("TGS")** is an industrial gas distributor in the U.S. dedicated to the heating, ventilation, and air conditioning ("HVAC") market, which Taronis Fuels acquired as a subsidiary in or around May 26, 2020.  TGS has locations in Lakeland, Florida; Atlanta, Georgia; and Dallas-Fort Worth, Texas.

16.     **Audit Firm** is an accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB") that was Taronis Fuels' outside auditor at all relevant times.

17.     **New CFO** was the CFO of Taronis Fuels from in or around November 5, 2020 to in or around December 18, 2020, and then again from in or around April 10, 2021 to in or around February 11, 2022.

## V.     FACTS

### A.     BACKGROUND

#### 1.     Background on Taronis Tech and Taronis Fuels

18.     Taronis Tech, first based in Florida and later in Arizona, produced and offered two types of products:  (i) fuel and gas products, including MagneGas, its metal cutting fuel marketed as a faster and safer alternative to acetylene, and (ii)

water conservation and sterilization products.  In connection with both types of products, Taronis Tech manufactured gasification and sterilization units of varying sizes (e.g., 50KW, 200KW, and 300KW), including its patented Venturi Plasma Arc gasification units ("Venturi units" or "Venturi gasification units"), which manufactured MagneGas.

19.     In or around December 5, 2019, Taronis Tech spun off its subsidiary Taronis Fuels, which was the fuel and gas side of the business, leaving Taronis Tech with the water side of the business.  However, even after the spin-off, Taronis Tech's and Taronis Fuels' gasification and sterilization units, including Venturi and non-Venturi units, continued to be produced and stored together in Clearwater, Florida, and Taronis Tech and Taronis Fuels management sometimes took investors and potential investors on tours of the facilities and operations there.

20.     Taronis Fuels then tried to expand its business, including by forming the Turkish JV with the goal that Taronis Fuels' joint venture partner, Turkish Family Company B, would try to market and sell 300KW Venturi gasification units in Turkey and the surrounding countries in that region, as described below. Turkish Family formed Turkish Family Company B specifically for the Turkish JV.

21.     Taronis Fuels also then began expanding its business through acquisitions, including completing its acquisition of TGS in or around May 26, 2020, which it described in a May 27, 2020 Taronis Fuels' press release as the "[l]argest [a]cquisition in [c]ompany [h]istory," resulting in "an  immediate, significantly positive financial impact on the Company's overall financial outlook."

## 2. <u>Governing Accounting Principles and Relevant Accounting Terminology</u>

22.     As a Commission-registered company with publicly traded stock from approximately February 2020 to May 23, 2022, Taronis Fuels was required to file with the Commission annual (audited) and interim (un-audited) financial statements, prepared in accordance with GAAP.

23.     GAAP is a series of authoritative standards set out by policy boards (including the Financial Accounting Standards Board, or "FASB"), that standardizes and regulates the definitions, assumptions, and methods used in accounting across industries, and seeks to ensure that a company's financial statements are complete, consistent, and comparable.

24.     FASB's Accounting Standards Codification ("ASC") is the current source of GAAP. An Accounting Standards Update ("ASU") communicates how the ASC is amended, and why and when GAAP changes.

25.     At all relevant times, Section 606-10-25 of FASB's ASC (and its subsections) was the relevant governing source of GAAP for revenue recognition. According to FASB ASU No. 2014-09, "Revenue from Contracts with Customers" (Topic 606) (May 2014), the core revenue recognition principal is that an entity should "recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services." To achieve that, an entity should apply these five steps for recognizing revenue: (i) identification of the contract with the customer, (ii) identification of the contractual performance

obligations, (iii) determine the transaction price, (iv) allocate the transaction price to the contractual performance obligations, and (v) recognize revenue when or as the entity satisfies a performance obligation.

26.    Cost of goods sold ("COGS"), sometimes referred to as cost of revenues ("COR"), is the accumulated total of all costs used to create a product (or service), which has been sold.

27.    Gross profit is net sales minus COGS.

28.    According to the ASC's Glossary:

   a.    Gross Margin is "[t]he excess of sales over cost of goods sold. Gross margin does not consider all operating expenses."

   b.    Inventory is "[t]he aggregate of those items of tangible personal property that have any of the following characteristics: (a) [h]eld for sale in the ordinary course of business, (b) [i]n process of production for such sale, [and] (c) [t]o be currently consumed in the production of goods or services to be available for sale," but "excludes long-term assets subject to depreciation accounting, or goods which, when put into use, will be so classified."

   c.    Goodwill is "[a]n asset representing the future economic benefits arising from other assets acquired in a business combination . . . that are not individually identified and separately recognized."

29.    Receivables are monetary obligations owed to an entity by its customers (and debtors).

**B.    TARONIS TECH'S FALSE AND MISLEADING STATEMENTS**

30.    From approximately January 2019 to March 2020, Taronis Tech and Mahoney issued numerous materially false and misleading press releases touting agreements and relationships with customers that did not exist or were

exaggerated, including with the City of San Diego, a franchise of Popeye's Louisiana Kitchen, Inc. ("Popeye's"), Smithfield Foods, Inc. ("Smithfield"), and the Turkish government.  As described below, only one of these materially false and misleading press releases ever was clarified (and even that clarification was misleading).

31.     Mahoney frequently drafted the materially false and misleading press releases or provided information to third parties to include in the press releases (and approved the drafts before issuance); was quoted in nearly all of them; controlled the press release process, including both content and timing; and had ultimate authority for issuance of the final versions.

32.     Then, in July 2019, in anticipation of Taronis Fuels' spin-off from Taronis Tech and "[g]iven the heightened importan[ce] of [] outward communication during the split process," Mahoney drafted an internal "Communication Plan" for issuing Taronis Tech and Taronis Fuels press releases each week to:  "generate lasting interest" in both companies "prior to the corporate split"; regain Taronis Tech's compliance with NASDAQ's price listing requirements; and create liquidity for Taronis Fuels when it was on OTC Link and build a case for up-listing it to NYSE.  Mahoney circulated this "Communication Plan" to Taronis Tech's and Taronis Fuels' boards of directors, Head of Business Development, and Head of Investor Relations.

33.     Mahoney knew or was severely reckless in not knowing that the statements in these press releases were false and misleading, in part because he

oversaw Taronis Tech's day-to-day operations and knew the agreements in question were aspirational only.

### 1. Materially False and Misleading Statements and Omissions Regarding the City of San Diego

34.     Despite another Taronis Tech executive's objection, on January 28, 2019, Mahoney signed and Taronis Tech filed a Form 8-K, attaching a materially false and misleading Taronis Tech press release, announcing "the City of San Diego has elected to use MagneGas as its metal cutting fuel of choice, marking the first major city contract for the adoption of our metal cutting fuels."

35.     Mahoney had drafted the press release himself and sent it via email to Taronis Tech's Investor Relations Firm (the "IR Firm") at the time, and then noted in a January 25, 2019 email to the IR Firm that it was Taronis Tech's "first city wide contract."  Even though another Taronis Tech executive contacted Mahoney and told him that he should not issue the press release, when the IR Firm sent Mahoney back a draft of the press release with track changes, Mahoney responded with "Approved" and subsequently signed the Form 8-K, attaching it as an exhibit, on January 28, 2019.

36.     In or around January 29 or 30, 2019, the City of San Diego called and emailed Taronis Tech's IR Firm regarding the press release and requested that the press release be taken down because there, in fact, was no contract.

37.     As a result, on February 12, 2019, Taronis Tech filed another Form 8-K, signed by Mahoney, "to correct its prior disclosure" because Taronis Tech did "not have any formal binding contracts, agreements or long-term purchase

commitments with the City of San Diego." However, even that Form 8-K was false and misleading because it falsely stated Taronis Tech "had approval and a written authorization . . . to move forward with the procurement of gas." In reality, the City of San Diego never had a business relationship or agreement with Taronis Tech, and the City of San Diego never agreed to purchase any products or services from Taronis Tech.

**2.  Materially False and Misleading Statements and Omissions Regarding Popeye's**

38.    Taronis Tech and Mahoney also issued two materially false and misleading press releases designed to give the investing public the impression that a Popeye's franchise was a paying client of its majority-owned subsidiary, Water Pilot, LLC ("Water Pilot").

39.    On October 21, 2019, Taronis Tech issued a press release entitled, "Water Pilot Wins 5 Installations with Large Popeye's Franchise." The press release stated that the Popeye's franchise "ha[d] authorized an initial five locations for paid installations of the Water Pilot's water conservation technology," and if those installations "deliver[ed] the expected savings in water utility expenses," the franchise "anticipate[d] authorizing the install at all 115 locations." Shortly before this press release was issued though, on October 10, 2019, Wilson had requested that the Popeye's "contract" be assigned from another entity to Water Pilot, to which a representative from the other entity replied that it only used a Scope of Work ("SOW") agreement. Wilson then clarified, "we are going to do the assignment without seeking consent of the customer. It will cause problems."

14

40.     Then, in a February 3, 2020 press release, Taronis Tech announced winning a "$260,000 Client Commitment" with the "successful execution of a pilot program with a 130 location Popeye's franchise operator in Florida."  Mahoney was quoted in the press release stating, "This is an excellent example of how successful pilot programs can lead to scalable revenue generation."

41.     In reality, although a Popeye's Florida franchisee allowed a Taronis Tech subsidiary to test water technology (the franchisee was not obligated to pay anything unless it was satisfied with the test results and wanted to keep the valve installed during the test), the franchisee immediately terminated that relationship after seeing and being surprised by the February 3, 2020 press release.

42.     Despite this, in a Taronis Tech investor presentation for the quarterly period ending March 31, 2020 ("Q1 2020"), which was attached as an exhibit to a Form 8-K that was signed by Mahoney and filed with the Commission on February 20, 2020, Taronis Tech utilized Popeye's logo under the heading "Representative Franchisee Clients."

### 3.     Materially False and Misleading Statements and Omissions Regarding Smithfield

43.     Taronis Tech and Mahoney also made a number of materially false and misleading statements to give the overall impression that Taronis Tech had an agreement with Smithfield, a large hog producer in North Carolina, or that Smithfield had agreed to a pilot program.

44.     On December 12, 2019, Taronis Tech issued a press release, "Taronis Provides Corporate Update," in which it stated that Taronis Tech was "actively

15

engaged in dialogue with one of the largest hog producers in the US" to deploy "sterilization units at scale across North Carolina." Mahoney was quoted in the press release describing those discussions as "positive and meaningful." However, according to the former Chief Technology Officer ("CTO") of Taronis Tech and Taronis Fuels, Taronis Tech's first interactions with Smithfield did not take place until in or around January or February 2020 when he met with Smithfield during a trip to Washington, D.C. The CTO further confirmed that Taronis Tech did not have any interaction with other hog producers in North Carolina.

45.    On January 31, 2020, Taronis Tech issued another press release, "Taronis Provides Summary of Shareholder Town Hall." The press release stated, "Taronis Water, a wholly owned subsidiary of Taronis Technologies has made meaningful progress on a strategic relationship with one of the largest global hog producers to positively impact the North Carolina hog waste issue."

46.    To further the impression that Taronis Tech had an agreement with Smithfield, in the Q1 2020 Taronis Tech investor presentation mentioned above in paragraph 42, Taronis Tech utilized Smithfield's logo under the heading "Priority Stakeholders."

47.    Then, on March 9, 2020, Taronis Tech issued another press release, announcing that it was constructing three new water sterilization units to "be dedicated to serving the hog industry in North Carolina." According to the press release, two Taronis Tech 300KW Venturi units would be used for water sterilization purposes and the third unit would be used for reclamation of metals

16

(e.g., copper, iron, potassium, etc.) from sediment at the bottom of hog waste lagoons.  Upon seeing this press release, a Taronis Tech and Taronis Fuels investor contacted Taronis Tech's Investor Relations ("IR") contact, who told the investor that Taronis Tech would not be building these machines if there was no deal in place.  In fact, there was never any agreement with Smithfield, and there was never any agreement to utilize any sterilization unit for the hog industry in North Carolina.

48.    In addition, in a revenue recognition memorandum ("memo") that Mahoney drafted for the Audit Firm, dated August 5, 2020, Mahoney described a February 10, 2020 meeting with Smithfield to discuss the potential for use of Taronis Tech units for water sterilization purposes at Smithfield's hog farms. However, the memo admitted that:  "[t]he meeting took an unexpected turn, as Smithfield's engineers had only recently adopted an alternative water treatment solution at a significantly reduced cost relative to Tech's proposed solution," making "the original intent of the meeting largely unproductive and without financial merit."  Given Smithfield made it clear at that February 10, 2020 meeting that it had no need for Taronis Tech units for water sterilization purposes, they then discussed the possibility of metal reclamation.   Therefore, Mahoney acknowledged in this memo that as of February 10, 2020, Smithfield had no need for any units, much less two designated units, for water sterilization purposes.

49.    Despite these false and misleading statements, Smithfield never entered into an agreement with Taronis Tech, never agreed to engage with Taronis

Tech for any pilot program, never agreed to purchase any product or service from Taronis Tech, and was not interested in Taronis Tech's technology.

### 4.   Materially False and Misleading Statements and Omissions Regarding Turkey

50.   Finally, Taronis Tech and Mahoney made a number of materially false and misleading statements regarding Taronis Tech's (and Taronis Fuels') business in Turkey, including to give the impression that its wholly-owned subsidiary at the time, Taronis Fuels, had an agreement with the Turkish government.

51.   From mid-2019 to early 2020, Taronis Tech announced two large contracts for Taronis Fuels connected to Turkey:

- On July 22, 2019, Taronis Tech issued a press release regarding a "$165 Million Contract" under which Taronis Fuels purportedly was selling gasification units to a "Turkish Gas Consortium" (the "$165 Million Contract").

- On January 6, 2020, Taronis Tech issued a press release announcing a marketing agreement with Turkish Family Company B purportedly to market fifty 300KW Venturi gasification units at $5 million each (which would be a total of $250 million) to thirteen countries in the region surrounding Turkey (the "$250 Million Contract"), which also "call[ed] for the immediate sale of one 300KW Venturi plasma arc gasification unit for $5 million" to Turkish Family Company B to serve as a demonstration ("demo") unit for marketing purposes.

In reality, both contracts actually were with the Turkish Family's companies, Turkish Family Company A and Turkish Family Company B, and under these agreements, the Turkish Family, which had connections to Turkish government officials, and its companies would try to market and sell 300KW Venturi gasification units to the Turkish government and private companies in Turkey and its surrounding countries.  And, in fact, the $250 Million Contract did not reflect

any agreement to market fifty 300KW Venturi units, contrary to what Taronis Tech had announced to the market.

52.   Despite the reality of this arrangement, Taronis Tech (and later Taronis Fuels, as described in Section C below) made numerous materially false and misleading statements to give the appearance that Taronis Fuels had an agreement with the Turkish government.  Examples include:

- On October 3, 2019, Taronis Tech issued a press release in which Mahoney provided an update on the $165 Million Contract and touted the company's relationship with the Turkish government.  Mahoney was quoted in part, "The government of Turkey fully recognizes the potential impact of using MagneGas" in light of safety incidents in Turkey, and "we can partner to help dramatically reduce these incidents"; and "[w]e estimate that this is a $200 million annual revenue opportunity based on the analysis provided by Turkish government representatives."

- In a December 30, 2019 press release, Taronis Tech and Mahoney again touted a relationship with the Turkish government, stating that the Turkish government said the Turkish market has "approximately $200 million in annual consumption" and would require approximately 100 of Taronis' 300KW gasification units, and that the Turkish "government has informed Taronis to be prepared to deliver all one hundred gasification units over a 24 month time frame," which "would require a significant expansion of the existing $165 million purchase contract, which covers only thirty gasification units."

- In a February 24, 2020 press release describing that Taronis Fuels was scheduling the delivery of a 50KW unit to Turkey, Mahoney was quoted, "This is a very positive next step in our relationship with [Turkish Family Company B] and the Turkish government."

53.   In addition, numerous Taronis Tech (and later Taronis Fuels, as described in Section C below) press releases, when touting the $165 Million Contract, did not make it clear that, despite terms in the contract, Taronis Tech understood that the counterparty was not purchasing units, but instead, was trying

to market and sell units to the Turkish government, and even under the contractual terms, selling 15 of the 30 units were optional, thus making the contract only worth $82.5 million if the option was not exercised, which it never was.  Examples of such Taronis Tech press releases, in addition to the October 3, 2019 and the December 30, 2019 press releases listed in the preceding paragraph, include:

- an October 15, 2019 press release, "Taronis and [Turkish Family Company A] Provide Turkey Business Update";

- a December 12, 2019 press release, "Taronis Provides Corporate Update";

- a December 23, 2019 press release, "Taronis Satisfies All Conditions for MagneGas Sales in Turkey"; and

- the January 6, 2020 press release discussed earlier in paragraph 51 and entitled, "Taronis Fuels Executes Letter of Intent for $5 Million Purchase Order."

54.    In reality, (i) the Turkish government never had any agreement with any Taronis entity (and was never obligated in any way to purchase any units); (ii) the Turkish Family failed to sell a single unit in either Turkey or the surrounding countries; (iii) Taronis Fuels never received any payments under these contracts; and (iv) only one 50KW demo unit, not subject to any contract, was shipped from Clearwater, Florida to Ankara, Turkey for the Turkish Family to market.  Pursuant to the terms of the purported $250 Million Contract touted by Taronis Tech, Taronis Fuels, and Mahoney, Taronis Fuels was supposed to ship a 300KW Venturi unit, not a 50KW unit, to Turkish Family Company B for marketing and demonstration purposes.  Yet, Taronis Tech issued a press release on December 12, 2019, in which Mahoney was quoted as "eager to get started on the mass

production of our 300 KW Venturi plasma arc gasification units for immediate deployment to Ankara in early 2020."

55.     Mahoney had ultimate authority for, control over, and knowledge of the above materially false and misleading statements and omissions made in Taronis Tech's press releases and Q1 2020 investor presentation regarding the City of San Diego, Popeye's, Smithfield, and Turkey, many of which were issued after Mahoney developed his "Communication Plan," in part, to "generate lasting interest" in Taronis Tech and also to regain Taronis Tech's compliance with NASDAQ's price listing requirements.

## C.     TARONIS FUELS' FALSE AND MISLEADING STATEMENTS

56.     From approximately February 2020 to November 2020, Taronis Fuels and Mahoney also made materially false and misleading statements in Taronis Fuels' press releases.  None of these materially false and misleading press releases ever were corrected or clarified.

57.     Similar to Taronis Tech's process, Mahoney frequently drafted Taronis Fuels' materially false and misleading press releases; was quoted in nearly all of them; controlled the press release process, including both content and timing; and had ultimate authority for issuance of the final versions.

58.     While Taronis Fuels ultimately formed an External Communications Committee of the Board of Directors to review press releases, this was strictly a "paper" process without substance.   Indeed, members of the External Communications Committee relied on Mahoney for the veracity of information in

draft press releases, Mahoney could and would reject their proposed edits, and the committee members did not approve press releases or even receive supporting materials for the press releases. Instead, Mahoney had ultimate authority for deciding upon the final versions and issuance of Taronis Fuels' press releases.

59.     In addition to making materially false and misleading statements in press releases regarding Taronis Fuels' financial statements (as described further in Section D below), Taronis Fuels and Mahoney also made a number of materially false and misleading statements regarding Turkey, including with respect to the $165 Million Contract and the $250 Million Contract. Similar to Taronis Tech, Taronis Fuels frequently did not make it clear that the "purchaser" behind the $165 Million Contract actually was trying to market and sell 300KW Venturi units to other parties, and that, even by its terms, the $165 Million Contract only was for 15 units with an option for an additional 15 units, for a total of $82.5 million, if the option was not exercised. Mahoney knew or was severely reckless in not knowing that the statements in these press releases and investor presentations were false and misleading, as Mahoney was heavily involved with respect to Turkey, and travelled there a number of times. Examples of these materially false and misleading statements include:

- On February 5, 2020, Taronis Fuels filed a Form 8-K with the Commission, signed by Mahoney, attaching a Q1 2020 Taronis Fuels Investor Presentation that referenced the "$165MM initial contract excluding royalties."

- On March 11, 2020, Taronis Fuels and Mahoney issued a press release regarding shipping the first gasification unit to Turkey, with Mahoney

quoted, "delivery and commissioning of this unit represents the final milestone for the Turkish government to fund the large-scale deployment of up to 100 gasification units." However, as articulated above, no Taronis entity ever had a contract with the Turkish government. The March 11, 2020 press release also omitted that the gasification unit being shipped from Clearwater, Florida to Ankara, Turkey was a 50KW unit, not a 300KW Venturi unit, and both the $165 Million Turkey Contract and the $250 Million Marketing Contract were for 300KW Venturi units.

- In an April 2, 2020 press release, Taronis Fuels discussed the "30 unit, $165 million contract" and how the "commissioning process is the final condition requested by the Turkish Ministry of Energy and Natural Resources before the acceleration of the $18.75 [million] in payments commence," which was followed by a payment breakdown schedule, concluding in September 2020. Taronis Fuels never received any payments from the Turkish government.

- On April 21, 2020 and June 8, 2020, Taronis Fuels and Mahoney issued two press releases, which also discussed delivery and commissioning of a unit as the final requirement of the Turkish Ministry of Energy and Natural Resources for Taronis Fuels to receive payments for the five 300KW Venturi units.

- On June 11, 2020, Taronis Fuels filed a Form 8-K with the Commission, signed by Mahoney, attaching a Q2 2020 Taronis Fuels Investor Presentation that referenced a "30-unit $165 million initial contract plus 3% royalties" and a 5-unit "27.25 million purchase order." However, Taronis Fuels did not have a $27.25 million purchase order.

- On August 19, 2020, Taronis Fuels filed a Form 8-K with the Commission, signed by Mahoney, attaching a Q3 2020 Taronis Fuels Investor Presentation that again referenced a "30-unit $165 million initial contract plus 3% royalties" and a 5-unit "27.25 million purchase order." The presentation further falsely stated that manufacturing had begun with respect to that 5-unit order. In reality, Taronis Fuels never manufactured or even began manufacturing a 300KW Venturi unit for Turkey.

- On September 14, 2020, Taronis Fuels and Mahoney issued a press release regarding "the $165 million, 30-unit contract currently in place," and how "the existing $18.75 million, five-unit purchase order was formally approved and released by Turkish authorities, and the

23

order has been modified to $20 million . . . ," and the Turkish government granted an importation approval "[a]s part of the initial $20 million, five-unit funding approval." However, the only purchase orders that Taronis Fuels had were to sell units to the Turkish JV, i.e., a related party. Taronis Fuels did not have any purchase orders with the Turkish government (as described further below in Section D.3.).

60.   In addition, Taronis Fuels also posted to its various social media accounts to further the appearance that Taronis Fuels had an agreement with the Turkish government. For example, when Taronis Fuels shipped the 50KW demo gasification unit from Clearwater, Florida to Ankara, Turkey in 2020, the actual recipient of the unit was the Turkish Family and Turkish Family Company B, which was going to use the unit to try to market and sell 300KW units to governments and private companies in Turkey and the surrounding countries. However, Taronis Fuels created the impression that the 50KW unit actually was for the Turkish government. On February 13, 2020, Taronis Fuels posted to its Twitter account that "key senior representatives from the Turkish Ministry of Natural Resources" were participating in "an inspection of the mobile gasification unit [Taronis Fuels was] preparing for expedited delivery to Ankara," as seen in the screenshot below.



61.     The above screenshot was part of a visit that Mahoney and others at Taronis Fuels organized for Turkish government officials to travel to and tour Taronis Fuels' facilities and operations in Clearwater, Florida, as discussed in a February 18, 2020 press release entitled, "Taronis Hosts Turkish Delegation at Florida Production Facilities," and as shown in the screenshots below of Taronis Fuels' posts on February 13, 2020 and February 14, 2020, to its Twitter account. Mahoney also attended this tour in Clearwater, Florida, in February 2020.



**Taronis Fuels, Inc.** @TaronisFuels · Feb 13, 2020 ...
Our team was producing MagneGas live today at our Florida facilities for the
Head of Energy Investments within the Ministry of Natural Resources for
Turkey.





**Taronis Fuels, Inc.** @TaronisFuels · Feb 14, 2020 ...
Troy Galvin, Executive Vice President of Eastern U.S. Sales and Operations,
took the senior representatives from the Turkish Ministry of Natural
Resources on a tour to explain how our fill plant at the Clearwater store
works today.



62.     That February 18, 2020 press release regarding the Turkish delegation's tour of the company's operations in Clearwater, Florida further created the impression that there was a contract with the Turkish government by referencing "an initial $18.75 million purchase order scheduled for delivery in the second quarter of 2020"; and then later stating, "the Turkish government will require Taronis to deliver one hundred 300KW Venturi plasma arc gasification units to Turkey by the end of 2021."  In reality, not a single 300KW Venturi unit was ever purchased or delivered to Turkey for the Turkish government or any third party purchaser.

63.     In addition, Taronis Fuels made two-pagers, describing Taronis Fuels' business and U.S. and international growth strategies, publicly available on the internet, which falsely stated the Turkish JV was backed by the Turkish government and that there was a $500 million contract, as shown in the two screenshots below.  Based on the website links (shown in the footnote), the one on the left suggests it is from April 2020 and the one on the right suggests it is from June 2020.[1]

---

[1] *See* https://taronisfuels.com/wp-content/uploads/2020/04/Taronis-Fuels-2-Pager_TRNF.pdf (last visited August 10, 2022); https://taronisfuels.com/wp-content/uploads/2020/06/Taronis-Fuels-2-Pager_TRNF_Q2_2.pdf (last visited August 10, 2022).

 

64.     Finally, in or around March 2021, Mahoney told a Taronis Tech and Taronis Fuels investor during a call that Taronis Fuels was waiting on a "payment from the Turkish government, with which Taronis Fuels had an agreement."

65.     Mahoney had ultimate authority for, control over, and knowledge of the above materially false and misleading statements and omissions made by Taronis Fuels, especially given his involvement with respect to Turkey.

### D.     TARONIS FUELS' IMPROPER ACCOUNTING

66.     Mahoney and Wilson engaged in a fraudulent accounting scheme to improve Taronis Fuels' financial statements during periods in which Taronis Fuels' stock was trading on OTC Link and when Taronis Fuels was raising money from investors through private placement offerings, which are discussed further in Section E below.  In furtherance of this fraudulent accounting scheme, Mahoney and Wilson engaged in misconduct themselves and directed and supervised Taronis Fuels' accounting employees to do so, as described below.

67.     In particular, Mahoney acted as an accountant when, among other things, he directed accounting entries, drafted a revenue recognition memo, and supervised Taronis Fuels' accounting staff.  Wilson acted as an accountant when,

among other things, he acted in his CFO capacity, reviewed accounting entries, reviewed a revenue recognition memo and drafted supporting documentation for same, and supervised Taronis Fuels' accounting staff.

68.     Taronis Fuels used a bonus performance matrix, pursuant to which it awarded bonuses to executives based on meeting certain targets (e.g., selling units, increasing revenues).  Both Mahoney and Wilson received certain salary payments as well as payments characterized as bonuses and vacation payouts during the relevant period.

69.     Detailed below are instances in which Mahoney and Wilson improperly moved a number of Taronis Tech's purported assets to Taronis Fuels and, in the quarterly periods for Q2 2020 and Q3 2020, in which Taronis Fuels improperly recognized revenue due to an incorrect application of GAAP and improperly reduced COGS without substantiation, with a material impact on Taronis Fuels' financial statements.   Taronis Fuels, not the Audit Firm, was responsible for its Q2 2020 and Q3 2020 (unaudited) financial statements, and Mahoney and Wilson signed the Forms 10-Q for those interim quarters with knowledge of the accounting misconduct described below.

### 1.     Improper Entries between Taronis Tech and Taronis Fuels in Taronis Fuels' 2019 Form 10-K

70.     On May 22, 2020, Taronis Fuels filed its Form 10-K for the fiscal year ending December 31, 2019 (the "2019 Form 10-K") with the Commission, signed by Mahoney and Wilson as the principal executive and financial officers of Taronis

Fuels.  This was the first annual or interim report filed by Taronis Fuels after it was spun-off from Taronis Tech in December 2019.

71.     In spinning off Taronis Fuels, Mahoney and Wilson improperly moved a number of Taronis Tech's purported assets to Taronis Fuels, which subsequently were recorded as assets in Taronis Fuels' 2019 financial statements, including approximately $1.2 million in prepaid commissions purportedly related to contracts for future services that should have stayed with Taronis Tech, and also approximately $622,000 in construction in progress ("CIP") inventory, which was associated with the water sterilization business and therefore should have stayed with Taronis Tech because Taronis Fuels was not involved in the water sterilization business.

### 2.  Q2 2020 Improper Revenue Recognition of $3 Million for Fake Unit Sale

72.     In April 2020, Mahoney and Wilson faked the sale of a 300KW Venturi unit from Taronis Fuels to Taronis Tech, under the guise that the unit would be used for a pilot program with Smithfield.  This fake sale materially improved Taronis Fuels' gross margins for the quarter.

73.     This "300KW Venturi unit" purportedly was sold for $3 million, based on the $3.75 million price for a 300KW Venturi unit under the $165 Million Contract, discounted by $750,000 to reflect the used nature of the unit.  In reality, such a unit's book value at the time was less than $600,000.  Taronis Fuels recorded it as a sale in its Q2 2020 and Q3 2020 Forms 10-Q, both signed by Mahoney and Wilson and filed on August 19, 2020 and November 19, 2020

respectively, and recognized all $3 million in revenue in Q2 2020. Taronis Fuels' Q2 2020 and Q3 2020 Forms 10-Q stated, "In accordance with the Company's revenue recognition policy, all three performance obligations were satisfied (i.e. the unit was delivered and all services were provided) during the second quarter."

74.     However, by late April 2020 (i.e., during Q2 2020), Wilson drafted a lease agreement, which was signed by Mahoney and Wilson, for Taronis Tech to lease the "unit" back to Taronis Fuels as of May 1, 2020 for 12 months (i.e., through April 30, 2021), and by June 2020 (i.e., still during Q2 2020), Taronis Tech was considering selling the "unit" back to Taronis Fuels.

75.     Pursuant to an August 17, 2020 press release regarding Taronis Fuels' "Record Second Quarter Results" that noted it was Taronis Fuels' "first EBITDA positive quarter in the Company's history," Taronis Fuels reported a $3 million "increase, or 51.8% increase in sales" for Q2 2020 (compared to Q2 2019) and "a significant improvement in gross margins" (81% for Q2 2020 compared to 47% for Q2 2019), as a result of this $3 million sale. The press release omitted to state that the purported $3 million unit sale was to Taronis Fuels' former parent.

76.     Despite Taronis Tech paying $3 million to Taronis Fuels, no unit was transferred to Taronis Tech, and this was not a real sale because:

- First, as discussed above, Smithfield never had an agreement with Taronis Tech and never engaged in a pilot program.

- Second, at the time of this "purported sale" in Q2 2020, Taronis Fuels did not even have a 300KW Venturi unit to sell.

- Third, by approximately April or May 2020, Taronis Tech no longer had operations.

77.     Nevertheless, Wilson and Mahoney forged an order confirmation, dated April 8, 2020, for the sale of this 300KW Venturi unit from Taronis Fuels to Taronis Tech for $3 million, listing the former Head of Business Development for both Taronis Tech and Taronis Fuels as the sales person, and stating that the system should be delivered to the buyer in Clearwater, Florida.  However, Taronis Fuels did not have a contract with Taronis Tech for the sale of this 300KW Venturi unit, and this purchase order was forged.   The former Head of Business Development knew nothing of this "purported sale" and had never seen the order confirmation.  In addition, Taronis Fuels never transferred a 300KW Venturi unit to Taronis Tech because Taronis Fuels did not even possess such a unit at the time to transfer.  Therefore, Taronis Fuels' recognition of this revenue did not meet the criteria required by Section 606-10-25 of the FASB's ASC.

78.     Despite all of this, Mahoney wrote a revenue recognition memo to the Audit Firm to support Taronis Fuels' recognition of $3 million in revenue in Q2 2020.  Mahoney provided versions of the memo and the forged order confirmation as support to the Audit Firm in mid-July 2020 and then updated versions of the memo in early August 2020.  The final August 2020 memo sent to the Audit Firm (copying Wilson) described utilization of the 300KW Venturi unit (and another 50KW unit) for a pilot program with Smithfield, likely to be launched prior to the end of 2020, but omitted to disclose that Taronis Fuels did not possess a 300KW Venturi unit at the time to sell to Taronis Tech and that, even if it did, Mahoney and Wilson had signed a lease agreement purporting to lease the 300KW Venturi

unit back to Taronis Fuels from May 1, 2020 through April 30, 2021 (i.e., even if the unit had existed, it would not have been available for a pilot program with Smithfield by the end of 2020).

79.    On August 18, 2020, Mahoney and Wilson also signed a management representation letter to the Audit Firm for Q2 2020, falsely stating that: the interim financial statements had been prepared in accordance with GAAP; Taronis Fuels was in compliance with all SOX requirements; they had "no knowledge of any fraud or suspected fraud affecting the Company involving (a) management; (b) employees who have significant roles in internal control; or (c) others where the fraud could have a material effect on the interim financial statements"; and that there had been "no material transactions that ha[d] not been properly recorded in the accounting records underlying the interim financial statements."  That letter also falsely stated that there had been no communications from the SEC nor any inquiries "concerning potential noncompliance with, or deficiencies in . . . financial reporting practices nor any other matters that could have [a] . . . material adverse effect on the financial statements."  However, the staff of the SEC had sent a request letter, dated June 30, 2020, to Taronis Tech, which included requests for Taronis Fuels' documents, including documents regarding Taronis Fuels' sales and revenues.

80.    Finally, in March 2021, Taronis Fuels retained an outside consultant to assist with technical accounting in connection with preparing its Form 10-K for the year ending December 31, 2020 (the "2020 Form 10-K").  Upon reviewing the revenue recognition memo that Mahoney drafted, the consultant emailed

Mahoney and the CFO at the time and wrote, "Here's the problem: Every significant fact in that memo is not supportable by written evidence." Mahoney ignored the consultant's warnings.

### 3.   <u>Q3 2020 Improper Revenue Recognition of $2.3 Million for Turkish Units Sales</u>

81.    In Q3 2020, Taronis Fuels recognized $2.3 million in revenue for gasification unit sales in Turkey, as reflected in Taronis Fuels' Q3 2020 Form 10-Q, signed by Mahoney and Wilson and filed with the Commission on November 19, 2020. That $2.3 million in revenue, which materially improved Taronis Fuels' gross margins for the quarter, can be broken down as follows:

- $2 million based on 10% of a $20 million purchase order for the sale of five 300KW Venturi units, and

- $300,000 of the $5 million sale of the 50KW demo unit shipped from Clearwater, Florida, to the Turkish Family in Turkey, which was described above in connection with the Taronis Tech and Taronis Fuels press releases.

Instead of paying $5 million to Taronis Fuels for the 50KW demo unit, any commissions earned by Turkish Family Company B for selling 300KW Venturi units to third parties were to be used to offset the $5 million receivable. Turkish Family Company B earned a 15% commission for any 300KW Venturi unit sales in Turkey or the surrounding countries. In this case, Taronis Fuels determined that, since it was recognizing $2 million in revenue of the $20 million purchase order, Turkish Family Company B thus earned a commission equal to 15% of that $2 million, i.e., $300,000. Instead of paying that $300,000 commission to Turkish Family Company B, Taronis Fuels used it to offset the $5 million receivable for the

sale of the 50KW unit to Turkish Family Company B, and thus, Taronis Fuels recognized that $300,000 as revenue on the sale of the 50KW demo unit shipped from Clearwater, Florida to Ankara, Turkey.

82.   On November 19, 2020, Taronis Fuels and Mahoney issued a press release regarding Taronis Fuels' Q3 2020 results, announcing "a $4.3 million increase, or 80% increase in sales" and "a significant improvement in gross margins" for Q3 2020 compared to Q3 2019, due in part due to $2.3 million in 300KW Venturi plasma arc gasification unit sales.

83.   In furtherance of the scheme to improperly recognize revenue in Q3 2020, Mahoney and Wilson created, or directed the creation of, a purchase order, dated September 3, 2020, from Taronis Fuels to the Turkish JV for the sale of five 300KW Venturi units, which required 40% of the purchase order, i.e., $8 million, due as a deposit within five days "acceptance of the binding purchase order." Turkish Family Company B sent a signed version of the purchase order to Mahoney and Wilson on September 11, 2020.  No 40% deposit was ever received, but Mahoney and Wilson still wanted to recognize revenue for the "sale" of these units in Q3 2020.

84.   A Taronis Fuels accounting employee made clear in an email on October 2, 2020 (i.e., in Q4 2020, which was the period from October 1, 2020 to December 31, 2020) to Mahoney, Wilson and other Taronis Fuels accounting employees, that there was no contractual basis to recognize the $2.3 million in revenue.  As a result, Mahoney and Wilson then took steps to amend the contract

in Q4 2020 and create documentation in Q4 2020, to send to the Audit Firm and justify Taronis Fuels' recognition of the $2.3 million in revenue for Q3 2020.

85.     On October 29, 2020 (i.e., Q4 2020), Wilson prepared a new purchase order, backdated to September 3, 2020, and emailed it to Mahoney, who then forwarded it to a member of the Turkish Family and Turkish Family Company B that same day, noting, "Can you please have this signed and sent back asap?  I need to update this for our auditors.  It is for the five units we signed in September.  We have removed the 10 day payment requirements so that there are no questions why we have not received payment yet."  The new backdated purchase order's terms stated that a 10% irrevocable deposit, equaling $2 million, was due and earning upon completion of a European Union ("EU") design configuration.

86.     On October 30, 2020, Turkish Family Company B emailed Mahoney and Wilson a signed copy of the backdated purchase order, which Wilson then emailed with other Turkey-related documents to a Taronis Fuels accounting employee on November 10, 2020.

87.     Later on November 10, 2020, that same accounting employee, who Wilson had emailed a copy of the backdated purchase order, then emailed a copy of a revenue recognition memo to the Audit Firm, copying Mahoney, Wilson, and others, along with supporting documentation including the backdated purchase order that Mahoney and Wilson had received on October 30, 2020.

88.     The revenue recognition memo, sent to the Audit Firm on November 10, 2020, outlined support for the recognition of the $2 million (i.e., 10%) deposit

36

from that purchase order, stating in part that a "purchase order was signed between the Company and a third-party Turkish customer" on September 3, 2020, with payment terms that a "10% irrevocable deposit [was] due and earned upon completion of the EU design configuration."  The memo to Audit Firm only referred to the backdated purchase order and its terms, noting it was signed September 3, 2020 (i.e., Q3 2020), when in reality it had been signed in late October 2020 (i.e., Q4 2020), and omitting entirely that there had been an earlier purchase order under which a payment had been due and never received.  As described above, neither version of the purchase order had been signed on September 3, 2020.  In addition, both versions of the purchase order, which Wilson had drafted, were for the sale of five 300KW Venturi units from Taronis Fuels to the Turkish JV.

89.    However, Taronis Fuels also did not have documentation reflecting the completion of the EU design confirmation.  On November 9, 2020, Wilson emailed a member of the Turkish Family, attaching a letter to execute to reflect that Taronis Fuels "has complied with its obligations to configure its 300KW Venturi Plasma Arc Unit . . . design to European Union standards."  Later that day, Wilson forwarded via email a signed copy of the letter to a Taronis Fuels accounting employee, who then emailed a copy of the letter along with an updated revenue recognition memo to the Audit Firm, copying Mahoney, Wilson, and others, on November 12, 2020, as support for the $2 million in revenue recognized on the $20 million purchase order.

90.     In addition, the $250 Million Contract needed to be amended so that a third-party deposit was not required for commissions to be applied to Turkish Family Company B's outstanding accounts receivable.  Therefore, Wilson drafted an amendment to the contract, which he sent to a member of the Turkish Family via email on November 10, 2020 for execution.  After receiving a final signed copy later that day, Wilson's paralegal sent it to a Taronis Fuels accounting employee, who included it with the other supporting materials when she sent the email with the revenue recognition memo to the Audit Firm on November 10, 2020.

91.     Finally, in order to recognize the $2.3 million in revenue, Taronis Fuels also changed its revenue recognition approach for the sale of gasification units in its Q3 2020 Form 10-Q.  Prior to the Q3 2020 Form 10-Q, Taronis Fuels recognized revenue from gasification unit sales "over time based on three performance obligations: (1) delivery of units, (2) services and (3) support services."  For the Q3 2020 Form 10-Q, Taronis Fuels stated that it recognized revenue from gasification unit sales "in accordance with identified performance obligations within each unique contract.  Typical performance obligations include: (1) design of the unit, (2) delivery of units, (3) implementation of services, and (3) [*sic*] ongoing support services."

92.     When the Audit Firm questioned the collectability of the $2 million from Turkey, Mahoney reassured the Audit Firm via email on November 11, 2020 that he would be collecting the $2 million the following week during his trip to Turkey.  Mahoney failed to collect the $2 million on that trip, and he returned from

Turkey in or around November 20, 2020.  Taronis Fuels filed its Q3 2020 Form 10-Q on November 19, 2020.  At no point while in Turkey, prior to the Q3 2020 Form 10-Q filing, did Mahoney contact the Audit Firm and inform them that he had failed to collect the $2 million he had promised to collect while in Turkey.

93.     As described above, the recognition of this $2.3 million in revenue in Q3 2020 was improper because:

- First, as stated throughout this Complaint, Taronis Fuels never manufactured or shipped any 300KW Venturi units to Turkey.  The only unit ever shipped to Turkey was a 50KW unit that was not subject to any contract.

- Second, Taronis Fuels never received any payment from any party in Turkey, including the Turkish government.

- Third, Taronis Fuels did not have any independent third-party purchasers for its 300KW Venturi units, and the revenue recognition memo sent to the Audit Firm falsely stated "collectability is reasonably assured as the Purchaser is a governmental entity."  As stated above, no Taronis entity ever had an agreement with the Turkish government.

- Fourth, as described in this section, Taronis Fuels falsely claimed it completed a contractual performance obligation that was not a performance obligation under any contract in effect during Q3 2020, i.e., completion of the EU design.

94.     Given that recognizing $2 million in revenue in connection with the $20 million backdated purchase order was improper, there also was no basis to recognize $300,000 in revenue, as a 15% commission of that $2 million, offset against the $5 million receivable for the 50KW unit sale.  In addition, as described above, in order to apply any commission to Turkish Family Company B's

outstanding accounts receivable, a deposit would have to have been received (which was not received), based on the contract in effect during Q3 2020.

95.    Despite all of this, on November 19, 2020, Mahoney and Wilson signed another representation letter to the Audit Firm for Q3 2020, falsely stating that: the interim financial statements had been prepared in accordance with GAAP; Taronis Fuels was in compliance with all SOX requirements; they had made "all financial records and related data" available to the Audit Firm; they had "no knowledge of any fraud or suspected fraud affecting the Company involving (a) management; (b) employees who have significant roles in internal control; or (c) others where the fraud could have a material effect on the interim financial statements"; and there had been "no material transactions that ha[d] not been properly recorded in the accounting records underlying the interim financial statements." That letter also falsely stated that there had been no communications from the SEC nor any inquiries "concerning potential noncompliance with, or deficiencies in . . . financial reporting practices nor any other matters that could have [a] . . . material adverse effect on the financial statements." However, as mentioned above in paragraph 79, the staff of the SEC had sent a request letter, dated June 30, 2020, to Taronis Tech, which included requests for Taronis Fuels' documents, including documents regarding Taronis Fuels' sales and revenues.

96.    In looking at this transaction in March 2021 in connection with preparing Taronis Fuels' 2020 Form 10-K, a member of Taronis Fuels' Board of Directors emailed Mahoney and asked, "Scott, help us understand how we go from

a unit sales contract with [Turkish Family Company B], who I understand is our partner, to the recording of $2 million in revenue, which supposedly was coming from the Turkish government.  And how did we record $300,000 in commission on something that was not actually sold?  Your email suggests several milestones that were imposed on us by the government.  Does anyone have those milestone requests in writing from anyone in an official capacity in Turkey?"  Taronis Fuels did not have any writing from the Turkish government reflecting any milestone requests.

97.    Finally, the outside consultant assisting in anticipation of filing Taronis Fuels' 2020 Form 10-K also reviewed the revenue recognition memo that had been sent to the Audit Firm and noted in an email to the CFO at the time on March 25, 2021 (which later was forwarded to Mahoney) that certain parts of the memo were not consistent with the written agreements, such as the purchaser being a governmental entity.

### 4.    Taronis Fuels' Acquisition of TGS

98.    On May 26, 2020, Taronis Fuels closed the TGS acquisition, announcing it in a May 27, 2020 press release, as the "largest acquisition in company history" for $8 million, which had an "immediate, significantly positive financial impact on the Company's overall financial outlook," by bringing "in approximately $300,000 in added monthly EBITDA," resulting in Taronis Fuels post-acquisition being "able to generate positive EBITDA cash flows across its combined US operations."

99.    On May 28, 2020, Taronis Fuels filed a Form 8-K, signed by Mahoney, disclosing a material definitive agreement for and completion of the acquisition, as required (within 4 business days of the consummation of the acquisition), but failed to include TGS's historical financial statements or pro forma information in either the initial Form 8-K or an amended Form 8-K (within 71 calendar days after the initial Form 8-K was required to be filed).  At the time, Taronis Fuels also had not sought or received a waiver of this requirement from the SEC's Division of Corporation Finance.

100.   However, at the time of the acquisition, Taronis Fuels accounting team had determined that the TGS acquisition was significant, and that the total GAAP purchase price of TGS was actually $12.196 million (i.e., compromised 27% of Taronis Fuels' consolidated total assets (calculated based on 2019 total consolidated assets of approximately $45.10 million)).  However, because "there was a disagreement with the executive team," there was no progress on the transaction post-disagreement.

101.   By October 2020, a new Taronis Fuels accounting employee drafted a memo to Taronis Fuels' executive team, also concluding that the purchase price should have been $12.196 million, and that TGS was a significant acquisition, and that, "In general, Reg S-X 3-05, if deemed significant, requires the filing of separate pre-acquisition historical financial statements when the acquisition of a significant business has occurred."  Then, a January 2021 presentation for Taronis Fuels' Board of Directors listed the purchase price for TGS as $12 million.  Yet, Taronis

Fuels never filed an amended Form 8-K with TGS's historical financial statements or pro forma information.

### 5.    Q2 2020 and Q3 2020 Improper Reductions to COGS

102.    In November 2020, Taronis Fuels hired the New CFO to replace Wilson, although Wilson continued in his role as GC.  Employees in Taronis Fuels Accounting Department then advised the New CFO of reductions to COGS that Mahoney (with Wilson's knowledge) had directed them to make without substantiation that resulted in Taronis Fuels understating costs and increasing gross profit by approximately $2.72 million.  Overall, this caused an approximate 26% reduction to COGS and an approximate 21% increase to Taronis Fuels' gross profit for the nine months ended September 30, 2020.  Described below are the three instances where Mahoney, with Wilson's knowledge, directed the Taronis Fuels Accounting Department to reduce COGS without substantiation.

103.    First, in or around May 2020, the Taronis Fuels Accounting Department was supposed to post a journal entry ("JE") for approximately $500,000 loss of inventory for the South Region to be written off, and instead, posted an erroneous JE benefiting COGS by approximately $1 million, thus resulting in an approximate $1.54 million misstatement of inventory and COGS, which impacted Taronis Fuels' Q2 2020 financials.

104. A Taronis Fuels accounting employee raised reversing these erroneous JEs with Mahoney and Wilson in August and September 2020, but Mahoney directed her not to reverse them until a physical inventory count for all

regions was completed. However, that inventory count did not happen until December 2020 when the New CFO ordered it after the Taronis Fuels accounting employee raised this issue with her.

105. After Taronis Fuels conducted the physical inventory, Taronis Fuels needed to make approximately $1 million in adjustment entries because the NAV trial balance showed approximately $1 million more in inventory than what was counted during the physical inventory.

106. Second, in connection with the TGS acquisition, Taronis Fuels acquired certain cylinders for approximately $438,000 and made two erroneous JEs – one at the local level to debit inventory and credit COGS, instead of goodwill, and one at the corporate level to debit Property, Plant & Equipment ("PP&E") fixed assets ("FA") and credit COGS a second time, instead of goodwill. As a result, Taronis Fuels' gross margin was inflated by approximately $876,000 in Q3 2020, in connection with the TGS acquisition. Once a Taronis Fuels accounting employee realized the errors, she emailed Mahoney and requested to make adjustments to COGS, but Mahoney orally instructed her to make unjustified adjustments to goodwill and inventory in lieu of reducing COGS by $876,000, despite the fact that these cylinders were FA, not inventory.

107. Third, in approximately October 2020, Mahoney directed a Taronis Fuels accounting employee in an email, on which Wilson was copied, to make a one-time topside JE to debit inventory and credit COGS by $300,000 without any inventory count to substantiate the JE because Mahoney thought gross margin was

low, despite the fact that the Taronis Fuels accounting employee had provided her analysis to Mahoney indicating there were no issues with the margins. When the Taronis Fuels accounting employee wanted to reverse the JE because it was incorrect, Mahoney would not discuss it with her or approve the reversal.

108. With assistance from the Accounting Department, the New CFO prepared an "Overview of Fraud" PowerPoint presentation with supporting materials, alleging Mahoney and Wilson engaged in fraud based on these above described reductions to COGS, for a special board meeting on December 18, 2020. Both the presentation and supporting materials were sent to Taronis Fuels' Board of Directors, including Mahoney, in advance of the special board meeting. Below is a screenshot of the first page of that PowerPoint presentation.

## Overview of Fraud

- Three instances in 2020 in which the CEO directed improvements to COGS (Cost of Goods Sold) with no substantiation, understating costs and increasing Gross Profit by $2.72 million.
  - Adjustment #1: In Q2 2020, an inventory count in the South region discovered a mis-posted entry, overstating inventory and understating COGS by a cumulative amount $1.54 million. The CEO overrode the recommendation of the accounting manager and directed via email that the correction not be made until an inventory count of all regions is completed, which was not undertaken until the new CFO called for one in December.
  - Adjustment #2: In Q3 2020, $438k worth of cylinders were incorrectly recorded twice. In response to an email flagging the issue, the CEO orally directed that neither entry be corrected, and that the accounting department instead make unjustified adjustments to Goodwill and Inventory in lieu of reducing COGS by $876k.
  - Adjustment #3: Also in Q3 2020, the CEO directed the accounting department via email to reduce COGS by an additional $300k, without any basis other than the CEO's view that gross margin was too low in August 2020.

109. Prior to that December 18, 2020 special board meeting, Mahoney obtained Board approval to suspend the New CFO for potential breaches of fiduciary duties and confidentiality, so at the meeting, instead of hearing the

presentation, the board appointed special committees to investigate the allegations against the New CFO and against Mahoney and Wilson, and voted for Mahoney to be Interim CFO.  The New CFO (now suspended) and an independent director, who had abstained from voting, subsequently resigned.

### 6.   Restatement Announcement and New Management

110.   On March 31, 2021, Taronis Fuels filed a Form 12b-25, signed by Mahoney but listing Wilson as the person to contact regarding the notification, which stated that Taronis Fuels could not file its 2020 Form 10-K in a timely manner, due to "unanticipated delays, due to its independent registered public accountant requiring additional time to complete their review."  No other reasons were listed on the filed Form 12b-25 for why Taronis Fuels' 2020 Form 10-K could not be filed on a timely basis.  The filed Form 12b-25 further indicated that no anticipated "significant change in results of operations from the corresponding period for the last fiscal year [would] be reflected by the earnings statements to be included in the" 2020 Form 10-K.  Taronis Fuels failed to attach a statement from the Audit Firm or any other exhibit to the filed Form 12b-25, as required by Rule 12b-25(c) under the Exchange Act.

111.   In April 2021, after a proxy fight, Mahoney and Wilson were ousted from Taronis Fuels, and the New CFO returned to help run the company (but resigned in February 2022).  Taronis Fuels also appointed a new CEO and replaced all but one of its prior directors on its board.

112.    Once new management was on board, on April 12, 2021, Taronis Fuels filed a Form 8-K, stating that its "previously issued financial statements for the year ended December 31, 2019 and for each of the interim quarterly periods in fiscal 2020 should not be relied upon" and "that certain revenues and gross profit in the third quarter of fiscal 2020 were recognized prematurely or inaccurately due to an incorrect application of" GAAP.  The Form 8-K then outlined numerous potential errors in Taronis Fuels' previously issued financial statements, including but not limited to, in revenue recognized from international sales, entries between Taronis Fuels and Taronis Tech, reporting of the TGS acquisition, and under-reporting of COGS or COR and the over-reporting of gross income in Q2 2020 and Q3 2020.  On August 5, 2021, Taronis Fuels announced in a press release that it anticipated completing a restatement by either the quarterly period ending December 31, 2021 ("Q4 2021") or ending March 31, 2022 ("Q1 2022").  However, on November 30, 2021, that timeframe was extended through calendar year 2022 after discovering data deficiencies "related to its IT system due to poor historic processes and controls."  Prior to filing to terminate its registration with the Commission on May 23, 2022, Taronis Fuels has not filed a restatement of its previously issued financial statements.

### E.    TARONIS FUELS' PRIVATE PLACEMENTS

113.    From approximately July 2020 to November 2020, Taronis Fuels conducted three private placements of Taronis Fuels' restricted common stock and debentures and warrants, relying on Rule 506(b) of Regulation D of the Securities

Case 8:22-cv-01939-TPB-AAS   Document 1   Filed 08/24/22   Page 48 of 79 PageID 48

Act, raising approximately $30 million, although Taronis Fuels paid back some of its July and August 2020 investors with interest and a prepayment penalty, in or around October and November 2020. Taronis Fuels filed Forms D with the Commission, signed by Wilson, for these offerings on August 10, 2020, October 14, 2020, and November 24, 2020.

114. Common stock purchase agreements and securities purchase agreements for these offerings (which also were included as form agreements in exhibits to Forms 8-K regarding these private placements signed by Mahoney and filed with the Commission on August 10, 2020, October 14, 2020, and November 24, 2020) contained representations and warranties by Taronis Fuels, including that financial statements in SEC filings had been prepared in accordance with GAAP "and fairly present[ed] in all material respects" the Company's consolidated financial position "and the results of operations and cash flows for the periods then ended . . . ." These representations and warranties were materially false and misleading, among other things, because of Taronis Fuels' improper recognition of revenue.

115. Finally, Mahoney and Wilson controlled the private placement process and spoke with investors and potential investors, and if investors or potential investors had questions about Taronis Fuels' financials, those investors and potential investors were directed to Taronis Fuels' financial statements in its SEC filings.

### F.    TARONIS FUELS' CARES ACT LOAN

116.    In 2020, the United States government established a business loan program called the Paycheck Protection Program ("PPP") through the Coronavirus Aid, Relief and Economic Security Act ("CARES Act") to provide loans backed by the U.S. Small Business Administration ("SBA") to "help[] businesses keep their workforce employed during the COVID-19 crisis."[2]

117.    In or around April 22, 2020, Taronis Fuels filed a Borrower Application Form (SBA Form 2483 (04/20)) to obtain a first draw PPP loan through Wells Fargo Bank, N.A. ("Wells Fargo"), which was signed by Taronis Fuels' Chief of Staff and Treasurer, who worked as an assistant to Mahoney and Wilson.  On the Borrower Application Form, Taronis Fuels selected "Payroll" and "Lease/Mortgage Interest" as the purposes of the loan. The Borrower Application Form further contained certifications, including but not limited to:

- "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule."

- "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

---

[2] See SBA's Website, Paycheck Protection Program, available here: https://www.sba.gov/ funding-programs/loans/covid-19-relief-options/paycheck-protection-program (last visited on August 10, 2022).

118.    Prior to submitting and signing that Borrower Application Form, Taronis Fuels' Chief of Staff and Treasurer had emailed Mahoney multiple times regarding the application, including:

- In an April 7, 2020 email chain discussing the loan application, including the purposes of the loan, Mahoney replied to Taronis Fuels' Chief of Staff and Treasurer and directed, "Payroll, healthcare, rents are fine."

- In an April 8, 2020 email to Mahoney, the Taronis Fuels' Chief of Staff and Treasurer attached a draft of the Borrower Application Form and other support for the application, and wrote to Mahoney, "Revised SBA form is attached.  I am ready to file whenever you have time to review . . . ."

119.    In its Form 10-K for the year-end December 31, 2019 and its Forms 10-Q for the first, second and third quarters of 2020, all of which were signed by Mahoney and Wilson, Taronis Fuels disclosed that, on May 8, 2020, it obtained an approximately $1.9 million PPP loan pursuant to the CARES Act, which was forgivable if Taronis Fuels provided documentation that (i) the loan proceeds were used for forgivable purposes, and (ii) "employee and compensation levels [we]re maintained."  However, according to the SBA's website, in order for a PPP loan to be forgiven, "[a]t least 60% of the proceeds [have to be] spent on payroll costs."[3]

120.    Neither Taronis Fuels nor its CFO at the time, Wilson, established or maintained sufficient internal accounting controls to ensure that the funds obtained from the PPP loan were utilized for their designated purposes of "Payroll"

---

[3] See SBA's Website, Paycheck Protection Program, PPP loan forgiveness, available here: https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-loan-forgiveness (last visited on August 10, 2022).

and "Lease/Mortgage Interest."  Instead, the funds were commingled within the company's general corporate accounts and used for purposes inconsistent with the loan's conditions.

121.   Despite listing the purposes of the loan as payroll and lease and mortgage interest payments on the application, Taronis Fuels did not use at least 60% of the proceeds of the PPP loan for those purposes (or earmark the funds for those purposes).  Instead, in May 2020, Taronis Fuels, at Mahoney's direction, used at least $1.4 million from the PPP loan to acquire TGS, which closed on May 26, 2020 and was announced on May 27, 2020.  At the time, Wilson was CFO and intimately involved in the details of the TGS acquisition, including the funding sources (for example, the wire transfer requests for the outgoing wires Taronis Fuels needed to make at closing were addressed to him).  Wilson, in fact, changed the date of the closing to May 26, 2020, in order to gather all the funds necessary, including at least $1.4 million from the PPP loan, to make the outgoing wire transfers that needed to be made at closing in order to complete the acquisition.

122.   Indeed, in a June 3, 2020 email shortly after the acquisition with Wilson and Taronis Fuels' Chief of Staff, Mahoney confirmed that Taronis Fuels was able to finance the acquisition at the end of May because Taronis Fuels "had $4MM in cash on hand due to access to $2MM from the PPP loan program, and $2MM on hand from cash flows from operations."

123.   Despite utilizing at least $1.4 million from the PPP loan to acquire TGS, Taronis Fuels subsequently filed a PPP Loan Forgiveness Application Form

(SBA Form 3508EZ (01/21)) in or around May 10, 2021, signed again by Taronis Fuels' Chief of Staff, requesting forgiveness of the entire approximately $1.9 million and then certifying, "The dollar amount for which forgiveness is requested (which does not exceed the principal amount of the PPP loan) . . . was used to pay business costs that are eligible for forgiveness . . . ; [and] includes payroll costs equal to at least 60% of the forgiveness amount . . . ." The PPP Loan Forgiveness Application Form contained other certifications as well, including, "I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges." The loan was forgiven in its entirety.

### G.   MATERIALITY

124.   All of Taronis Tech's and Taronis Fuels' false and misleading statements and omissions, the fraudulent accounting scheme to improve Taronis Fuels' financial statements, including the improper revenue recognition and COGS reductions, and Taronis Fuels' lack of internal controls for use of the proceeds from the CARES Act loan, set forth herein, individually and in the aggregate, were material to their respective companies. There is a substantial likelihood that a reasonable investor would have considered the misrepresented facts and omitted information regarding Taronis Tech's relationships with the City of San Diego, Popeye's, and Smithfield, Taronis Fuels' relationship with the Turkish government, the fact that Taronis Fuels recognized revenue prematurely or inaccurately due to the incorrect application of GAAP and engaged in other

improper accounting, and Taronis Fuels' use of the CARES Act loan, to be important.

125.   In addition, with respect to Taronis Fuels, the deceptive acts, described herein, were both in connection with the purchase or sale of securities and in the offer or sale of securities.  Among other things, Taronis Fuels, Mahoney and Wilson were offering private placements while making materially false and misleading statements and engaging in accounting and other fraud.  Additionally, Taronis Fuels, Mahoney, and Wilson obtained investors' money by means of misrepresentations and omissions in the offer and sale of Taronis Fuels' securities, as described above.

### H.   TARONIS TECH'S DELINQUENT FILINGS

126.   Finally, as stated above, Taronis Tech is delinquent in its periodic filings with the SEC, last filing a Form 10-Q on November 19, 2019, for the period ending September 30, 2019.

127.   Taronis Tech's last Form NT filing was a Form NT 10-K, filed on May 14, 2020, disclosing its inability to file its Form 10-K for the year ended December 31, 2019.

128.   In an October 19, 2020 Taronis Tech press release, Mahoney stated that Taronis Tech "has no material financial resources," and management has decided "to immediately liquidate all assets" and "apply for voluntary de-listing and dissolve the business" over "three to six months."  Yet, more than a year and a half later, Taronis Tech has failed to do so.

## VI.   CLAIMS FOR RELIEF

### COUNT I
### (Against Taronis Fuels, Mahoney, and Wilson)
### Violations of Section 17(a)(1) of the Securities Act

129.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

130.   From approximately April 2020 to November 2020, Taronis Fuels, Mahoney, and Wilson, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

131.   By reason of the foregoing, Taronis Fuels, Mahoney, and Wilson, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### COUNT II
### (Against Taronis Fuels, Mahoney, and Wilson)
### Violations of Section 17(a)(2) of the Securities Act

132.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

133.   From approximately April 2020 to November 2020, Taronis Fuels, Mahoney, and Wilson, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts

necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

134.   By reason of the foregoing, Taronis Fuels, Mahoney, and Wilson, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### COUNT III
### (Against Taronis Fuels, Mahoney, and Wilson)
### Violations of Section 17(a)(3) of the Securities Act

135.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

136.   From approximately April 2020 to November 2020, Taronis Fuels, Mahoney, and Wilson, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which have operated, are now operating, or will operate as a fraud or deceit upon the purchasers.

137.   By reason of the foregoing, Taronis Fuels, Mahoney, and Wilson, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

### COUNT IV
### (Against Taronis Tech, Taronis Fuels, Mahoney, and Wilson)
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5(a) thereunder

138.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

139.   Taronis Tech (from approximately January 2019 to March 2020), Taronis Fuels (from approximately February 2020 to November 2020), Mahoney (from approximately January 2019 to November 2020), and Wilson (from approximately February 2020 to November 2020), directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly employed devices, schemes or artifices to defraud.

140.   By reason of the foregoing, Taronis Tech, Taronis Fuels, Mahoney, and Wilson, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] thereunder.

<u>**COUNT V**</u>
**(Against Taronis Tech, Taronis Fuels, Mahoney, and Wilson)**
<u>**Violations of Section 10(b) of the Exchange Act**</u>
<u>**and Rule 10b-5(b) thereunder**</u>

141.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

142.   Taronis Tech (from approximately January 2019 to March 2020), Taronis Fuels (from approximately February 2020 to November 2020), Mahoney (from approximately January 2019 to November 2020), and Wilson (from approximately February 2020 to November 2020), directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading.

143.   By reason of the foregoing, Taronis Tech, Taronis Fuels, Mahoney, and Wilson, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

### COUNT VI
### (Against Taronis Tech, Taronis Fuels, Mahoney, and Wilson)
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5(c) thereunder

144.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

145.   Taronis Tech (from approximately January 2019 to March 2020), Taronis Fuels (from approximately February 2020 to November 2020), Mahoney (from approximately January 2019 to November 2020), and Wilson (from approximately February 2020 to November 2020), directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which operated as a fraud upon the purchasers of such securities.

146.   By reason of the foregoing, Taronis Tech, Taronis Fuels, Mahoney, and Wilson, directly and indirectly, have violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] thereunder.

## COUNT VII
### (Against Taronis Fuels for Forms 10-Q for Q2 2020 and Q3 2020)
### Violations of Section 13(a) of the Exchange Act
### and Rules 12b-20 and 13a-13 thereunder

147.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

148.   Taronis Fuels was at all relevant times an issuer that had a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*].

149.   Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-13 [17 C.F.R. § 240.13a-13] thereunder require issuers of registered securities to file with the SEC factually accurate quarterly reports on Forms 10-Q.  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.  According to Regulation S-X [17 C.F.R. § 210.4-01(a)], financial statements filed with the Commission pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], which are not prepared in accordance with GAAP, will be presumed to be misleading or inaccurate, despite footnotes or other disclosures.

150.   On April 12, 2021, Taronis Fuels filed a Form 8-K stating that its previously issued financial statements for the year ended December 31, 2019 and the 2020 interim quarterly periods should not be relied upon, including in part due to the improper recognition of certain revenues due to the incorrect application of GAAP.

151.   By reason of the foregoing, Taronis Fuels violated and unless enjoined, is reasonably likely to continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.12b-20 and 240.13a-13] thereunder.

## COUNT VIII
## (Against Mahoney and Wilson)
## Aiding and Abetting Taronis Fuels' Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder

152.   The Commission repeats and realleges Paragraphs 1 through 128 and 150 of its Complaint.

153.   As alleged above in Count VII, Taronis Fuels violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.12b-20 and 240.13a-13] thereunder.

154.   From approximately April 2020 to November 2020, through their improper revenue recognition practices and other means alleged above, Mahoney and Wilson knowingly, or with extreme recklessness, provided substantial assistance to, and thereby aided and abetted, Taronis Fuels' violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.12b-20 and 240.13a-13] thereunder.

155.   By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Mahoney and Wilson aided and abetted, and unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.12b-20 and 240.13a-13] thereunder.

## COUNT IX
### (Against Taronis Fuels)
### Violations of Section 13(b)(2)(A) of the Exchange Act

156.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

157.   From approximately April 2020 to November 2020, Taronis Fuels failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions of the company and dispositions of its assets.

158.   By reason of the foregoing, Taronis Fuels violated and unless enjoined, is reasonably likely to continue to violate, Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## COUNT X
### (Against Mahoney and Wilson)
### Aiding and Abetting Taronis Fuels' Violations of
### Section 13(b)(2)(A) of the Exchange Act

159.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

160.   As alleged above in Count IX, Taronis Fuels violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

161.   From approximately April 2020 to November 2020, through their improper revenue recognition practices and other means alleged above, Mahoney and Wilson knowingly, or with extreme recklessness, provided substantial assistance to, and thereby aided and abetted, Taronis Fuels' violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

162.   By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Mahoney and Wilson aided and abetted, and unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### COUNT XI
### (Against Taronis Fuels)
### Violations of Section 13(b)(2)(B) of the Exchange Act

163.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

164.   From approximately April 2020 to November 2020, through the improper revenue recognition practices, the CARES Act violations, and other means alleged above, Taronis Fuels failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances, among other things, that (a) transactions are executed in accordance with management's general or specific authorization; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets; and (c) access to assets is permitted only in accordance with management's general or specific authorization.

165.   By reason of the foregoing, Taronis Fuels violated and unless enjoined, is reasonably likely to continue to violate, Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## COUNT XII
### (Against Mahoney and Wilson)
### Aiding and Abetting Taronis Fuels' Violations of
### Section 13(b)(2)(B) of the Exchange Act

166.     The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

167.     As alleged above Count XI, Taronis Fuels violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

168.     From approximately April 2020 to November 2020, through their improper revenue recognition practices, the CARES Act violations, and other means alleged above, Mahoney and Wilson knowingly, or with extreme recklessness, provided substantial assistance to, and thereby aided and abetted, Taronis Fuels' violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

169.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Mahoney and Wilson aided and abetted, and unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## COUNT XIII
### (Against Mahoney and Wilson)
### Violations of Section 13(b)(5) of the Exchange Act
### and Rule 13b2-1 thereunder

170.     The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

171.    From approximately April 2020 to November 2020, Mahoney and Wilson, directly or indirectly, knowingly falsified or caused the falsification of Taronis Fuels' books, records, or accounts required to be made and kept by Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which contributed to the issuance of materially misleading financial statements by Taronis Fuels.

172.    By reason of the foregoing, Mahoney and Wilson, directly and indirectly, have violated, and unless enjoined, are reasonably likely to continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder.

### COUNT XIV
### (Against Mahoney and Wilson)
### Violations of Exchange Act Rule 13b2-2

173.    The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

174.    From approximately April 2020 to November 2020, Mahoney and Wilson, both officers of Taronis Fuels, directly or indirectly, made or caused to be made materially false and misleading statements to accountants at the Audit Firm, or omitted to state, or caused others to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to accountants at the Audit Firm, in connection with audits, reviews, or examinations of the financial statements of Taronis Fuels or the preparation or filing of any document or report required to be filed with the SEC.

175.   By reason of the foregoing, Mahoney and Wilson, directly and indirectly, have violated, and unless enjoined, are reasonably likely to continue to violate Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

**COUNT XV**
**(Against Mahoney and Wilson)**
**Violations of Exchange Act Rule 13a-14(a)**

176.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

177.   Despite knowing or being severely reckless in not knowing of the accounting misconduct described above, Mahoney and Wilson signed the certifications in Taronis Fuel's Form 10-K for the fiscal year ended December 31, 2019 and Forms 10-Q for the Q1 2020, Q2 2020, and Q3 2020 interim quarterly periods, as the principal executive and principal financial officers of Taronis Fuels, and certified, among other things, that they had reviewed the reports, and based on their knowledge, the reports (a) did not contain any untrue statements or omissions of material fact, (b) the financial statements contained in the reports fairly presented, in all material respects, the financial condition, the results of the operations of the company, and its cash flows, and (c) the signing officers were responsible for establishing and maintaining adequate internal controls over financial reporting, had designed and evaluated such controls, and had disclosed any significant deficiencies or material weaknesses or any fraud involving management to the Audit Firm and the Audit Committee of Taronis Fuels' Board of Directors.

178.   By reason of the foregoing, Mahoney and Wilson have violated, and unless enjoined, are reasonably likely to continue to violate Exchange Act Rule 13a-14(a) [17 C.F.R. § 240.13a-14(a)].

### COUNT XVI
### (Against Mahoney and Wilson)
### Violations of Section 304(a) of SOX

179.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

180.   Taronis Fuels filed a Form 10-K for fiscal year 2019 and Forms 10-Q for each of the first three quarters of fiscal year 2020, all of which were signed by Mahoney and Wilson, which were in material non-compliance with its financial reporting requirements under the federal securities laws.

181.   Due to Taronis Fuels' material non-compliance with its financial reporting requirements under the federal securities laws, and as a result of the misconduct described above, Taronis Fuels announced that it was required to prepare an accounting restatement for fiscal year 2019 and the first three quarters of fiscal year 2020.

182.   Mahoney and Wilson received or obtained, during the statutory time periods established by SOX, bonuses, incentives and/or equity-based compensation, which they have failed to reimburse to Taronis Fuels.

183.   The Commission has not exempted Mahoney or Wilson, pursuant to Section 304(b) of SOX [15 U.S.C. § 7243(b)], from the application of Section 304(a) of SOX [15 U.S.C. § 7243(a)].

184.    By reason of the foregoing, Mahoney and Wilson have violated, and unless enjoined, are reasonably likely to continue to violate Section 304(a) of SOX [15 U.S.C. § 7243(a)].

### COUNT XVII
### (Against Taronis Fuels)
### Violations of Section 13(a) of the Exchange Act
### and Rules 12b-20 and 13a-11 thereunder

185.    The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

186.    Taronis Fuels was at all relevant times an issuer that had a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*].

187.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-11 [17 C.F.R. § 240.13a-11] thereunder require issuers of registered securities to file with the SEC factually accurate current reports on Form 8-K.  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

188.    Rule 3-05 of Regulation S-X [17 C.F.R. § 210.3-05] requires a registrant to provide separate audited annual and unaudited interim pre-acquisition financial statements of an acquired or to be acquired business, based on the conditions specified in the definition of "significant subsidiary" in Rule 1-02(w) of Regulation S-X [17 C.F.R. § 210.1-02(w)].

189.   In connection with the Form 8-K filed on May 28, 2020 or any subsequent Form 8-K, Taronis Fuels failed to file TGS' pre-acquisition financial statements and pro forma information and did not obtain a waiver of this requirement from the Commission.

190.   By reason of the foregoing, Taronis Fuels violated and unless enjoined, is reasonably likely to continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] thereunder.

## COUNT XVIII
### (Against Taronis Fuels)
### Violations of Section 13(a) of the Exchange Act
### and Rule 12b-25 thereunder

191.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

192.   Taronis Fuels was at all relevant times an issuer that had a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*].

193.   Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1 and 12b-25 [17 C.F.R. §§ 240.13a-1 and 240.12b-25] thereunder require issuers of registered securities to file with the SEC factually accurate annual reports on Form 10-K, and if any such annual report is not filed within the time period prescribed for such report, the registrant, no later than one business day after the due date for such report, shall file a Form 12b-25 with the Commission which shall contain disclosure of its inability to file the report timely and the reasons therefore in reasonable detail, as well as any anticipated, significant changes in results of

operations from the corresponding period for the last fiscal year, and explanation of the anticipated changes, both narratively and quantitatively, and if appropriate, state the reasons why a reasonable estimate of the results cannot be made. Pursuant to Rule 12b-25(c), if the reason the report cannot be timely filed "relates to the inability of any person, other than the registrant, to furnish any required opinion, report or certification," the Form 12b-25 must attach, as an exhibit, a signed statement from that other person, listing the reasons why the other person is unable to furnish such "opinion, report or certification on or before such report must be filed."

194.   On March 31, 2021, Taronis Fuels filed a Form 12b-25 with no exhibits, which also failed to disclose why, in sufficient detail under the circumstances presented, its Form 10-K for fiscal year 2020 could not be timely filed, and also failed to acknowledge anticipated, significant changes in results of operations from the corresponding period for the last fiscal year, and an explanation of the changes, as required under the rule.  On April 12, 2021, Taronis Fuels filed a Form 8-K, disclosing its financial statements for the fiscal year ended December 31, 2019 and the 2020 interim quarterly periods should no longer be relied upon.  Taronis Fuels had failed to include in its Form 12b-25 any disclosure that the discovery, and ongoing correction, of errors in its prior financial statements were among the principal reasons that it was unable to file timely the subject Form 10-K for fiscal year 2020.

195.   By reason of the foregoing, Taronis Fuels violated and unless enjoined, is reasonably likely to continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 12b-25 [17 C.F.R. § 240.12b-25] thereunder.

### COUNT XIX
### (Against Taronis Tech)
### Violations of Section 13(a) of the Exchange Act
### and Rules 12b-20 and 13a-11 thereunder

196.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

197.   Taronis Tech has at all relevant times been an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*].

198.   Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-11 [17 C.F.R. § 240.13a-11] thereunder require issuers of registered securities to file with the SEC factually accurate current reports on Form 8-K.  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

199.   From approximately January 2019 to February 2019, Taronis Tech filed materially false and misleading Forms 8-K with respect to a purported contract and its relationship with the City of San Diego.

200.   By reason of the foregoing, Taronis Tech violated and unless enjoined, is reasonably likely to continue to violate, Section 13(a) of the Exchange

Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] thereunder.

**COUNT XX**
**(Against Mahoney)**
**Aiding and Abetting Taronis Tech's Violations of Section 13(a) of the**
**Exchange Act and Rules 12b-20 and 13a-11 thereunder**

201.    The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

202.    As alleged above in Count XIX, Taronis Tech violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] thereunder.

203.    From approximately January 2019 to February 2019, through his signing and filing of the Forms 8-K and other means alleged above, Mahoney knowingly, or with extreme recklessness, provided substantial assistance to, and thereby aided and abetted, Taronis Tech's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] thereunder.

204.    By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Mahoney aided and abetted, and unless enjoined, is reasonably likely to continue to aid and abet, violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] thereunder.

## COUNT XXI
### (Against Taronis Tech)
### Violations of Section 13(a) of the Exchange Act
### and Rules 13a-1 and 13a-13 thereunder

205.    The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

206.    Taronis Tech has at all relevant times been an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*].

207.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-1 and 13a-13 [17 C.F.R. §§ 240.13a-1 and 240.13a-13] thereunder require issuers of registered securities to file with the SEC factually accurate annual reports on Form 10-K for each fiscal year and factually accurate quarterly reports on Form 10-Q for each of the first three quarters of each fiscal year.

208.    Taronis Tech has failed to file Forms 10-K for the years ending December 31, 2019, December 31, 2020, and December 31, 2021 and has failed to file any Forms 10-Q for any quarterly periods since it filed its last Form 10-Q on November 19, 2019, for the quarterly period ending September 30, 2019.

209.    By reason of the foregoing, Taronis Tech violated and unless enjoined, is reasonably likely to continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1 and 13a-13 [17 C.F.R. §§ 240.13a-1 and 240.13a-13] thereunder.

### COUNT XXII
### (Against Mahoney and Wilson)
### Control Person Liability as to Mahoney and Wilson under Section 20(a) of the Exchange Act for Taronis Fuels' Violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, and 13a-13 thereunder

210.    The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

211.    From approximately April 2019 to April 2, 2021, Mahoney, and from approximately September 2019 to early November 2020, Wilson, had been, directly or indirectly, control persons of Taronis Fuels for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

212.    From approximately April 2020 to November 2020, Taronis Fuels violated Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, and 240.13a-13] thereunder through its accounting fraud and books and records and internal controls violations.

213.    As control persons of Taronis Fuels, Mahoney and Wilson are jointly and severally liable with and to the same extent as Taronis Fuels for each of the violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, and 240.13a-13] thereunder.

214. By reason of the foregoing, Mahoney and Wilson, directly and indirectly, have violated, and unless enjoined, are reasonably likely to continue to violate Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, and 240.13a-13] thereunder.

### COUNT XXIII
### (Against Mahoney)
### Control Person Liability as to Mahoney under Section 20(a) of the Exchange Act for Taronis Tech's Violations of Sections 10(b) and 13(a) of the Exchange Act and Rules 10b-5, 12b-20, and 13a-11 thereunder

215. The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

216. From approximately November 2018 to the present, Mahoney had been, directly or indirectly, a control person of Taronis Tech for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

217. From approximately January 2019 to March 2020, Taronis Tech violated Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, and 13a-11 [17 C.F.R. §§ 240.10b-5, 240.12b-20, and 240.13a-11] thereunder by issuing materially false and misleading press releases and Forms 8-K.

218. As a control person of Taronis Tech, Mahoney is jointly and severally liable with and to the same extent as Taronis Tech for each of the violations of Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and

Rules 10b-5, 12b-20, and 13a-11 [17 C.F.R. §§ 240.10b-5, 240.12b-20, and 240.13a-11] thereunder.

219.   By reason of the foregoing, Mahoney, directly and indirectly, has violated, and unless enjoined, is reasonably likely to continue to violate Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, and 13a-11 [17 C.F.R. §§ 240.10b-5, 240.12b-20, and 240.13a-11] thereunder.

### COUNT XXIV
### (Against Mahoney)
### Control Person Liability as to Mahoney under Section 20(a) of the Exchange Act for Taronis Fuels' Violations of Section 10(b) of the Exchange Act and Rules 10b-5 thereunder

220.   The Commission repeats and realleges Paragraphs 1 through 128 of its Complaint.

221.   From approximately April 2019 to early April 2021, Mahoney had been, directly or indirectly, a control person of Taronis Fuels for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

222.   From approximately February 2020 to November 2020, Taronis Fuels violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder by issuing materially false and misleading press releases, as alleged in Counts IV through VI.

223.   As a control person of Taronis Fuels, Mahoney is jointly and severally liable with and to the same extent as Taronis Fuels for each of the violations of

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

224.   By reason of the foregoing, Mahoney, directly and indirectly, has violated, and unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

<strong><u>RELIEF REQUESTED</u></strong>

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.   PERMANENT INJUNCTIONS AGAINST TARONIS TECH, TARONIS FUELS, MAHONEY, AND WILSON

225.   Issue a Permanent Injunction enjoining Taronis Tech and its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, and each of them, from violating, directly or indirectly, Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.

226.   Issue a Permanent Injunction enjoining Taronis Fuels and its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 12b-25, 13a-11, and

13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.12b-25, 240.13a-11, and 240.13a-13] thereunder.

227.   Issue a Permanent Injunction enjoining Mahoney and Wilson, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2] thereunder, and Section 304 of SOX [15 U.S.C. § 7243]; from aiding and abetting any violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§ 240.12b-20 and 240.13a-13] thereunder; and with respect to Mahoney, also from aiding and abetting any violations of Exchange Act Rule 13a-11 [17 C.F.R. § 240.13a-11].

### B.   DISGORGEMENT AND PREJUDGMENT INTEREST AGAINST TARONIS FUELS, MAHONEY, AND WILSON

228.   Issue an Order directing Taronis Fuels, Mahoney and Wilson to disgorge all ill-gotten gains or proceeds received, with prejudgment interest thereon, resulting from the acts and/or courses of conduct complained of herein.

### C.   CIVIL MONETARY PENALTIES AGAINST TARONIS TECH, MAHONEY, AND WILSON

229.   Issue an Order directing Taronis Tech to pay civil money penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and directing

Mahoney and Wilson to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

### D.   OFFICER AND DIRECTOR BARS AGAINST MAHONEY AND WILSON

230.   Issue an Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], permanently prohibiting Mahoney and Wilson from acting as officers or directors of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

### E.   PENNY STOCK BAR AGAINST MAHONEY

231.   Issue an Order pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], which bars Mahoney from participating in any offering of a penny stock, including acting as a promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance or trading in any penny stock; or inducing or attempting to induce the purchase or sale of any penny stock.

### F.   REIMBURSEMENT FROM MAHONEY AND WILSON TO TARONIS FUELS PURSUANT TO SOX SECTION 304(a)

232.   Issue an Order for Mahoney and Wilson to reimburse Taronis Fuels pursuant to Section 304(a) of SOX [15 U.S.C. § 7243(a)].

### G.      FURTHER RELIEF

233.    Grant such other and further relief as may be necessary and appropriate.

### H.      RETENTION OF JURISDICTION

234.    Further, the Commission respectfully requests that the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VI.    DEMAND FOR JURY TRIAL

235.    The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated:  August 24, 2022                  Respectfully submitted,

By:      s/ Christine Nestor
**Christine Nestor, Esq.**
Senior Trial Counsel
Florida Bar No. 597211
Direct Dial:  (305) 982-6367
Email: nestorc@sec.gov
***Lead Attorney***
***Attorney To Be Noticed***

**ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300

78

Of counsel:

Michelle Bosworth, Counsel
Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300